**Michael DISHNOW, Plaintiff–Appellee,**

v.

**SCHOOL DISTRICT OF RIB LAKE, Ramon Parks, and Paul Peterson, Defendants–Appellants.**

No. 95–2563.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 6, 1995.

Decided Feb. 28, 1996.

Daphne Webb, Lynn Bodie (argued), Stafford, Rosenbaum, Rieser & Hansen, Madison, WI, for Plaintiff–Appellee.

Michael J. Morse, Susan M. Love (argued), Wanda L. Hurr, Brent P. Benrud, Von Briesen, Purtell & Roper, Milwaukee, WI, for Defendants–Appellants.

Before POSNER, Chief Judge, and WOOD, Jr., and EVANS, Circuit Judges.

POSNER, Chief Judge.

Michael Dishnow was employed as a guidance counselor by a public high school in Rib Lake, a small town in northern Wisconsin. He brought this suit under 42 U.S.C. § 1983 against the school district, the superintendent of the school district, and the principal of the high school, claiming that they had fired him in retaliation for his exercising his First Amendment right to free speech. The jury agreed and returned a verdict in his favor of almost $400,000, of which some 60 percent was for humiliation and injury to reputation and most of the rest for lost wages. The judge cut down the award for humiliation and injury to reputation by 90 percent. The defendants have appealed. Dishnow has abandoned his cross-appeal, in which he sought restoration of the damages that the district judge had cut.

Dishnow had presented evidence that he was fired because he had written certain articles, which the school board considered scandalous or disreputable, for a local newspaper, plus a letter to the editors of the newspaper which had been published and which the board also reprobated; because he had tipped off the local media to a violation by the board of the state's open-meetings law; and because he had publicly and indeed vocally opposed the removal from the school library of the novel *Forever* by Judy Blume. The defendants presented evidence that Dishnow had been fired not because of any of these things but because he had committed fourteen acts of insubordination or unprofessional conduct, including referring to the principal at a faculty meeting as the "god damned administration," using the school's copying machine in violation of a school rule forbidding its use between 8:05 a.m. and 8:40 a.m. on school days, forgetting an appointment to address a class, and telling the school's librarian (in the presence of students) to "get fucked." The jury considered the fourteen-count indictment against Dishnow pretextual. It had every reason to do so. The prohibited use of the copying machine was particularly transparent, as no one else had ever been called on the carpet, let alone fired, for this peculiarly venial sin. The altercation with the librarian was mutu-

al, and both used the word "fuck"; Dishnow's one-day suspension (the librarian received merely a written reprimand) was surely all the punishment a sane administration would have meted out for the offense.

█ The defendants take a different tack, arguing that the articles and some of Dishnow's other expressive activities as well were not even prima facie protected by the First Amendment because they did not touch on matters of "public concern." This part of the defendants' submission is permeated, indeed vitiated, by a misunderstanding of the application of the First Amendment to public employees. We tried to dispel this misunderstanding in *Eberhardt v. O'Malley*, 17 F.3d 1023 (7th Cir.1994), a decision that the defendants have carefully refrained from citing in either of their briefs, though it is cited and discussed at length by their opponent. We explained that when the Supreme Court in its cases establishing and bounding the rights of public employees to exercise free speech limited those rights to speech on matters of "public concern," they did not mean matters of transcendent importance, such as the origins of the universe or the merits of constitutional monarchy; they meant matters in which the public might be interested, as distinct from wholly personal grievances—which whether or not protected by the First Amendment are too remote from its central concerns to justify judicial interference with the employment relation, *Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983)—and casual chit-chat, which is not protected by the First Amendment at all. *Swank v. Smart*, 898 F.2d 1247, 1251 (7th Cir.1990). When Dishnow spilled the beans to the media about the school board's violation of state law, or wrote articles for a local newspaper on such topics as the sharing of household tasks by a working couple, he was participating in a public dialogue on matters of interest to the public, and no more was required to place his speech, prima facie, within the protection of the First Amendment. That the public was not large, that the issues were not of global significance, and that Dishnow's participation was not (we mean no disrespect) vital to the survival of Western civilization did not place his speech outside the orbit of protection.

We are troubled that the defendants appear not to accept or even understand this fundamental point about American civil liberties.

█ True it is that speech which could not be prohibited by the state if uttered by a private person may be a lawful basis for discharge or other discipline when uttered by a public employee. *Connick v. Myers*, *supra*, 461 U.S. at 147, 103 S.Ct. at 1690. That is why we have used the term "prima facie" protection. A proper analysis of a public employee's First Amendment claim proceeds in a sequence of three steps. The first is to decide whether his speech, were it uttered by someone who was not a public employee, would be protected. If not, the case is at an end. If yes, the second step is to decide whether the speech falls within the category of personal employee grievances that the Supreme Court told us in *Connick* are not worthy of judicial intervention. If so, the case is at an end. But, if not, if, that is, as is clearly Dishnow's case, the speech concerns public issues rather than merely a personal grievance, we proceed to the third step, which involves deciding whether the public employer had a convincing reason to forbid the speech. If so, the protection is withdrawn. E.g., *id.* at 150, 103 S.Ct. at 1690–91; *Mt. Healthy City School District Bd. of Educ. v. Doyle*, 429 U.S. 274, 284, 97 S.Ct. 568, 574–75, 50 L.Ed.2d 471 (1977); *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968); *Yoggerst v. Hedges*, 739 F.2d 293, 295 (7th Cir.1984).

█ The defendants, because they do not understand the structure of the right and thought that Dishnow had failed at the threshold, did not ask the judge to find that his public utterances, though they were neither mere chit-chat nor personal grievances, but instead were addressed to matters of public concern, were so inimical to the maintenance of a proper educational atmosphere as to be constitutionally permissible grounds for discipline or discharge. At trial the defendants did elicit a bit of testimony that Dishnow's utterances had impeded the school's educational mission. Evidently this testimony did not impress the jury much, but

in any event the balancing of the interest in freedom of expression against the employer's interests is to be done by the judge, not the jury. *Waters v. Churchill,* —— U.S. ——, ——, 114 S.Ct. 1878, 1884, 128 L.Ed.2d 686 (1994); *Connick v. Myers, supra,* 461 U.S. at 148 n. 7, 150 n. 10, 103 S.Ct. at 1691 n. 7, 1692 n. 10; *Wright v. Illinois Dept. of Children & Family Services,* 40 F.3d 1492, 1499–1500 (7th Cir.1994); *Berger v. Battaglia,* 779 F.2d 992, 998 (4th Cir.1985). By failing to ask the judge to balance the interests, the defendants waived their *Connick* defense. They tell *us,* too late, that in an article in which Dishnow was reminiscing about his youth he encouraged his high-school charges to drink and smoke. The article in question, ominously entitled "The Rebel Within," was part of a series called "Rib Lake High School Counselor's Corner," and the author was identified as "Michael Dishnow Guidance Counselor." The article contains a recollection of a basketball coach "who smoked and 'hung out at Derries,' a local watering hole. He said, 'Do not drink and do not smoke, nor stay out late at night, and do not hang around with those that do.' And he did, and I did. Ah, that little devil within." Is this an incitement to high-school kids to drink and smoke? It takes a keen eye to find it. But that is not the point. The point is that the defendants, thinking that the issue was not whether they were *entitled* to restrict Dishnow's freedom to speak out on matters of public concern but whether they *had* restricted his right, failed to present to the judge the issue of warranted restriction of a public employee's freedom of speech. They were content to argue that Dishnow had not exercised his right of free speech, so that the First Amendment hadn't even been in the picture, and alternatively that they had fired him solely because of his fourteen infractions, none of which had involved speech arguably protected by the First Amendment. The first argument was frivolous and the second created a jury issue fairly resolved in Dishnow's favor.

■ The defendants' objections to the jury instructions are frivolous, and we move to the last issue, which is whether the award for humiliation and injury to reputation, now only $23,750, is nevertheless excessive. The

defendants failed to cite their strongest precedent for cutting down this award, *Avitia v. Metropolitan Club of Chicago, Inc.,* 49 F.3d 1219 (7th Cir.1995). The plaintiff had been a banquet captain at a Chicago club for eleven years and was fired, like Dishnow, in retaliation for the exercise of a legal right. He got a similar job at similar wages within three months. The evidence of his distress at being fired consisted only of brief testimony that he had been very upset when he went home after being fired, had cried, and "until now I can feel that." The jury awarded him $21,000 for the distress that being fired caused him. Expressing concern that if we upheld this award Avitia "will have furnished the script for countless plaintiffs in suits for wrongful discharge," and "twenty-one thousand dollars will tend to become the floor for the award of nonpecuniary damages in such cases," we cut the award in half, remarking, "Judges and juries must not be casual with other people's money." *Id.* at 1229.

The present case is sufficiently different to justify the higher but still modest award that the judge made after granting the remittitur. Even if Dishnow's testimony that he was upset by being fired is discounted utterly, he unlike Avitia was defamed. Avitia too had been fired on the pretext of poor performance, but there was no publicity and he had no trouble finding a substitute job. Dishnow's tormentors publicly accused him of fourteen acts of misconduct and these charges were disseminated throughout the community. It is true that they might not have been had he not requested a public hearing in an effort to rally public support. But it would be a considerable paradox, and more (as we shall see in a moment), to cut down an award of damages based on the First Amendment because the plaintiff had sought a public airing for his views on matters of public concern.

■ A job search lasting more than six months produced only one offer to Dishnow and that at a substantial reduction from his extremely modest salary at Rib Lake. He was handicapped in his search by not having a letter of recommendation from his previous employer and by having to explain to pro-

spective employers the circumstances in which he had been dismissed. The part of the jury's verdict that awarded damages for loss of future earnings compensated Dishnow for his having to take a job at a lower salary but not for the permanent depression in his career prospects from having been fired as a troublemaker. General damages are routine in defamation cases because of the difficulty of quantifying harm to reputation. General damages of $24,000 would not be considered excess in such a case even if the concept of "self-defamation" or "compelled republication"—illustrated by cases in which an employee by explaining why he lost his previous job repeats his previous employer's defamatory grounds—is rejected, as it is in most jurisdictions for reasons that we discussed in *Rice v. Nova Biomedical Corp.*, 38 F.3d 909, 911–12 (7th Cir.1994).

The valid insight at the heart of the concept of self-defamation, whether or not the concept itself is accepted, justifies Dishnow's decision to request a public hearing on the charges against him. He was not gratuitously publicizing the charges in an effort to magnify his damages. He was, if anything, attempting to mitigate his damages or exhaust his administrative remedies, since the public hearing might have resulted in his reinstatement, obviating, in all likelihood, this lawsuit. Mitigation and exhaustion are to be encouraged rather than penalized. This point would be entitled to no weight if Dishnow were arguing that the publicizing of the grounds of his termination prevented him from obtaining equivalent employment, thus depriving him of his constitutional liberty of occupation. E.g., *Lawson v. Sheriff of Tippecanoe County*, 725 F.2d 1136 (7th Cir. 1984). That would be a case in which the decision to seek a public hearing would have aggravated rather than mitigated the harm—would have constituted, in fact, an attempt to lever a simple case of wrongful termination or of defamation into a constitutional tort. The attempt cannot succeed. *Hostrop v. Board of Junior College District No. 515*, 523 F.2d 569, 573–74 (7th Cir.1975); *Clark v. Mann*, 562 F.2d 1104, 1116 (8th Cir.1977); *Cato v. Collins*, 539 F.2d 656, 660 (8th Cir. 1976).

Defamation, as we have just noted, even when committed by a public body, is not a constitutional tort. The interest in reputation that the common law tort of defamation protects has been held not to be a species of liberty or property within the meaning of the due process clauses of the Fifth and Fourteenth Amendments. *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). This may seem to doom Dishnow's effort to obtain damages for the injury to his reputation. Not so. When a right of liberty or property that *is* protected by the due process clauses is infringed, as it was here by the discharge of Dishnow in retaliation for his exercising his right of free speech, the plaintiff can recover his full common law damages, *Carey v. Piphus*, 435 U.S. 247, 254–64, 98 S.Ct. 1042, 1047–53, 55 L.Ed.2d 252 (1978), including damages for emotional injury, loss of reputation, and other intangibles. *Hessel v. O'Hearn*, 977 F.2d 299, 301–02 (7th Cir.1992); *Gilpin v. American Federation of State, County & Municipal Employees*, 875 F.2d 1310, 1314 (7th Cir.1989); *Baskin v. Parker*, 602 F.2d 1205, 1209–10 (5th Cir.1979). So if the infringement is incidentally defamatory, as it was here, the plaintiff can obtain the sort of damages that he would obtain in a defamation case. That is all that is involved here, and it has no counterpart in *Avitia*.

AFFIRMED.