# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued May 11, 2010           Decided July 23, 2010

No. 09-7080

MATTHEW AUGUST LEFANDE,
APPELLANT

v.

DISTRICT OF COLUMBIA,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-00217-HHK)

*Matthew A. LeFande* argued the cause pro se.

*Carl J. Schifferle*, Assistant Attorney General, argued the cause for the appellee. *Peter J. Nickles*, Attorney General, *Todd S. Kim*, Solicitor General, *Donna M. Murasky*, Deputy Solicitor General, and *Holly M. Johnson*, Assistant Attorney General, were on brief.

Before: GINSBURG, HENDERSON and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Matthew LeFande appeals the district court's dismissal of his complaint alleging the District of Columbia Metropolitan Police

Department (MPD) violated the First Amendment to the United States Constitution by terminating his position with the MPD Reserve Corps in retaliation for his making protected speech. LeFande argues the district court erred in holding his speech did not relate to a matter of public concern and was therefore not protected by the First Amendment. We agree and reverse.

I.

Taking as true the factual allegations in LeFande's complaint, *see City of Harper Woods Employees' Ret. Sys. v. Olver*, 589 F.3d 1292, 1298 (D.C. Cir. 2009), the relevant facts are as follows. The MPD Reserve Corps is a body of "unpaid volunteers who assist full-time officers of the [MPD] in the provision of law enforcement services." *Griffith v. Lanier*, 521 F.3d 398, 399 (D.C. Cir. 2008); *see* D.C. Code § 5-129.51(a)-(b). LeFande joined in 1993. On October 29, 2003, the Washington City Paper published a front-page article that described his work as a Reserve Corps member[1] and revealed "numerous shortcomings" of the MPD administration. Compl. ¶ 14, *LeFande v. District of Columbia*, C.A. No. 09-217 (D.D.C. Feb. 4, 2009). The MPD suspended him that same day and later issued him an official reprimand, ostensibly for "conduct alleged to have occurred on October 25, 2003," the nature of which conduct does not appear in the record. *Id.* ¶ 17. After the suspension expired, however, the MPD did not reinstate him. In

---

[1]Assuming the article's accuracy, LeFande's service in the Reserve Corps has at times been nothing short of heroic. Having pursued EMT training to build his public-service skill set, he once saved an injured FBI agent's life. The episode earned him a commendation from the Director of the FBI. Moreover, "[s]everal police officers, reserve and otherwise, say that LeFande has made more arrests than a lot of paid cops, that he's 'brilliant,' the 'poster boy' for the reserves." Jason Cherkis, *Almost Blue*, Washington City Paper, Oct. 31, 2003, reprinted at Joint Appendix 39-40.

response, on January 27, 2005, LeFande sued the District, alleging violations of the First and Fourteenth Amendments as well as common-law defamation. The suit settled when the District agreed to reinstate him as a Reserve Corps member.

Approximately one year later, the Reserve Corps changed. Specifically, on March 28, 2006, the MPD issued General Order 101.03, which prescribes the organization, authority, and rules of the MPD Reserve Corps. The General Order provides, among other things, that Reserve Corps members generally lack "the right to organize for collective bargaining purposes" and that they may "have their services . . . discontinued by the Chief, for any reason, at any time, without any right or process of appeal." MPD General Order 101.03 § IV.C.5, .7. The earlier version of the General Order did not prohibit collective bargaining and did not give the Chief such unchecked power to terminate a reserve officer. Then, on June 9, 2003, the Chief of the MPD published in the D.C. Register a "Notice of Emergency and Proposed Rulemaking," which announced his implementation, "on an emergency basis," of rules substantially similar to those contained in the General Order. 53 D.C. Reg. 4581. The Chief also gave "notice of intent to take final rulemaking action to adopt these rules" by amending the D.C. Municipal Regulations. *Id.* The rules provided, among other things, that "all Reserve Corps members shall serve at the pleasure of the Chief, who shall, without limitation, have the authority to . . . remove a Reserve Corps member from the Reserve Corps" without "administrative review." *Id.* § 1212.1.

Less than one month later, on July 6, 2006, LeFande filed a class action against the Chief on behalf of two named and the roughly two hundred unnamed Reserve Corps members, challenging the legality of the General Order and the Notice of Emergency and Proposed Rulemaking. He alleged the General Order violated the D.C. Administrative Procedure Act because the Chief issued it without allowing for public notice and

comment. *See* D.C. Code § 2-505(a) ("The Mayor and each independent agency shall, prior to the adoption of any rule . . . , publish in the District of Columbia Register . . . notice of the intended action . . . not less than 30 days prior to the effective date . . . ."). He alleged the Notice of Emergency and Proposed Rulemaking violated the same act because no predicate emergency existed. *See id.* § 2-505(c) ("[I]f, in an emergency, as determined by the Mayor or an independent agency, the adoption of a rule is necessary for the immediate preservation of the public peace, health, safety, welfare, or morals, the Mayor or such independent agency may adopt such rules as may be necessary in the circumstances, and such rule may become effective immediately."). And he alleged both the General Order and the Notice of Emergency and Proposed Rulemaking were illegal because they (1) denied Reserve Corps members "the right to organize for collective bargaining," in violation of the First Amendment and the National Labor Relations Act; (2) denied members the right to due process, in violation of the Fourteenth Amendment; (3) conflicted with District laws regarding MPD officers' training, authority and obligations; and (4) were enacted after the deadline set by their authorizing statute. Compl. ¶¶ 32-55, *MPD Reserve Officers v. Ramsey*, C.A. No. 06-1223 (D.D.C. July 6, 2006).

The district court dismissed LeFande's federal claims pursuant to Federal Rule of Civil Procedure 12(b)(6) and declined to reach the District law claims. He appealed in this court[2] and, one week before oral argument, the Chief of Police fired him. LeFande then filed the instant lawsuit, under 42

---

[2]We affirmed the dismissal, holding that the challenged actions left intact the plaintiffs' "First Amendment freedoms to speak and associate on matters related to collective bargaining" and that the plaintiffs "lack[ed] the statutorily-protected property interest to ground a due process challenge." *Griffith v. Lanier*, 521 F.3d 398, 400, 404 (D.C. Cir. 2008). We did not review LeFande's District-law claims.

U.S.C. § 1983, alleging the District violated the First Amendment by firing him "in retaliation for filing and prosecuting" the class action. Compl. ¶ 26, *LeFande v. District of Columbia*, C.A. No. 09-217 (D.D.C. Feb. 4, 2009). The district court dismissed his complaint, deciding that he had failed to state a First Amendment retaliation claim upon which relief could be granted because the action "did not relate to a matter of public concern." Mem. Op. at 6, *LeFande v. District of Columbia*, C.A. No. 09-217 (D.D.C. June 25, 2009).[3] Having found no matter of public concern, the district court did not address any of the other elements necessary to ground a First Amendment retaliation claim. This appeal timely followed.

## II.

A public employer "may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson*, 483 U.S. 378, 383 (1987). A public employee's right to speak, however, has limits. Mindful of the government's dual roles as sovereign and employer, *see Waters v. Churchill*, 511 U.S. 661, 675 (1994), we seek to balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Connick v. Myers*, 461 U.S. 138, 142 (1983) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)) (alteration in *Connick*). In order to achieve that balance, we use a four-part test to determine if a public employee's termination violated his First Amendment rights:

---

[3]LeFande also alleged common law defamation and breach of contract but the district court declined to exercise supplemental jurisdiction over the claims after dismissing their federal companions.

First, the public employee must have spoken as a citizen on a matter of public concern. Second, the court must consider whether the governmental interest in promoting the efficiency of the public services it performs through its employees outweighs the employee's interest, as a citizen, in commenting upon matters of public concern. Third, the employee must show that her speech was a substantial or motivating factor in prompting the retaliatory or punitive act. Finally, the employee must refute the government employer's showing, if made, that it would have reached the same decision in the absence of the protected speech.

*Wilburn v. Robinson*, 480 F.3d 1140, 1149 (D.C. Cir. 2007) (internal quotations, citations and alterations omitted). The first question—and the only question we reach—is whether the employee's speech "may be fairly characterized as constituting speech on a matter of public concern." *Rankin*, 483 U.S. at 384 (internal quotation omitted). If the speech is not on a matter of public concern, "the employee has no First Amendment cause of action based on his or her employer's reaction." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).

Whether speech involves a matter of public concern is a question of law, which we review de novo. *Connick*, 461 U.S. at 148 n.7; *Hall v. Ford*, 856 F.2d 255, 258 (D.C. Cir. 1988). Our analysis must take into account "the content, form, and context" of the employee's speech, "as revealed by the whole record." *Connick*, 461 U.S. at 147–48. Summarily put,

Speech by public employees may be characterized as not of "public concern" when it is clear that such speech deals with individual personnel disputes and grievances and that the information would be of no relevance to the public's evaluation of the performance of governmental agencies. On the other hand, speech

> that concerns "issues about which information is needed or appropriate to enable members of society" to make informed decisions about the operation of their government merits the highest degree of first amendment protection.

*Hall*, 856 F.2d at 259 (quoting *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983) (internal citations omitted)); *see also Tao v. Freeh*, 27 F.3d 635, 640 (D.C. Cir. 1994) (quoting *McKinley*); *Murray v. Gardner*, 741 F.2d 434, 438 (D.C. Cir. 1984) (same). In other words, "speech relates to a matter of public concern" if it is "'of political, social, or other concern to the community.'" *Hall*, 856 F.2d at 259 (quoting *Connick*, 461 U.S. at 146).

Because determining whether speech addresses a matter of public concern is such a fact-bound inquiry, we find it helpful to review existing precedent, which provides examples of speech that is—and speech that is not—a matter of public concern. On the one hand, the United States Supreme Court has identified several matters that *are not* of public concern, as have we. For instance, in *Connick*, the "confidence and trust" the district attorney's staff members had in their supervisors was not of public concern, nor was "the level of office morale," nor "the need for a grievance committee." 461 U.S. at 148. In *Murray*, the FBI practice of furloughing agents by lottery was not of public concern; the employee's speech merely amounted to "the quintessential employee beef: management has acted incompetently." 741 F.2d at 438. And, in *Barnes v. Small*, alleged assaults and false statements within the Army's Military Traffic Management Command were not matters of public concern; the employee's allegations "addressed only the misbehavior of other employees in his office, and not matters relating to any broader public interest." 840 F.2d 972, 982 (D.C. Cir. 1988).

On the other hand, both the Supreme Court and this court have identified several matters that *are* of public concern. In the seminal *Pickering* case, the Supreme Court held that a "difference of opinion" regarding "the preferable manner of operating the school system" is of public concern—particularly as it related to the school board's allocation of funds between educational and athletic programs and the "methods of informing, or preventing the informing of, the district's taxpayers" about the reasons additional funds were needed. 391 U.S. at 569, 571. Later, the Court enumerated several other previously established issues of public concern, including "[a] school district's allegedly racially discriminatory policies," "whether [a] college should be elevated to four-year status," and whether a public school should adopt a dress code for its teachers. *Connick*, 461 U.S. at 145-46 (citing *Perry v. Sindermann*, 408 U.S. 593 (1972); *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977); *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410 (1979)). Then, in *Connick*, the Court held that whether assistant district attorneys "feel pressured to work in political campaigns on behalf of office supported candidates" is also a matter of public concern. *Id.* at 149.

For our part, we held in *Hall* that whether a public university's "administration [wa]s mismanaging the athletic program" is a matter of public concern, as is the "structure of academic and athletic programs" generally. 856 F.2d at 259. Also, in *O'Donnell v. Barry*, we recognized as matters of public concern "important issues of Police Department policy," including "how to rank the Department's law-enforcement priorities," "how to reform the operations of the Property Division," "what priority to give an investigation of over a hundred unsolved murders," the impairment of "the effectiveness of the Homicide Branch" as well as the police chief's "fitness for office." 148 F.3d 1126, 1133-34 (D.C. Cir. 1998).

LeFande's speech[4] involves a General Order and an emergency rulemaking issued by the Chief of the MPD, which regulations, among other things, empowered the Chief to fire Reserve Corps members without process. According to LeFande, at the time of the Chief's actions, District law prohibited their dismissal without cause or process. *See Griffith*, 521 F.3d at 401; D.C. Code § 5-127.01 ("[N]o person shall be removed from said police force except upon written charges preferred against him . . . and after an opportunity shall have been afforded him of being heard in his defense . . . ."). Thus, LeFande maintained that, by asserting the power to fire Reserve Corps members without cause, and by restricting other aspects of the Corps' authority and access to training, the Chief substantially altered the rights and the role of the entire Reserve Corps, whose stated mission—according to the General Order itself—is to "play an *integral part* in the [MPD's] endeavor to provide high quality police service." MPD General Order 101.03 § II (emphasis added). Moreover, according to LeFande, the Chief made this change without providing the statutorily-mandated public notice and comment, in the absence of any enabling emergency.

We believe LeFande's allegations of procedural irregularities that unquestionably affect an integral component of police service are "relevan[t] to the public's evaluation" of the MPD and its Chief. *Hall*, 856 F.3d at 259 (quoting

---

[4]LeFande's speech is in the form of a civil complaint in federal court. Both parties correctly observe that we have not adopted the Third Circuit's position that a non-frivolous lawsuit by a public employee against his employer warrants First Amendment protection whether or not the suit relates to a matter of public concern. *See San Filippo v. Bongiovanni*, 30 F.3d 424, 443 (3d Cir. 1994). And neither party asks that we adopt that position. Thus, for simplicity's sake, we refer herein to LeFande's "speech," as opposed to his "petition," without opining on whether the distinction makes a difference.

*McKinley*, 705 F.2d at 1114). We think them more relevant than intra-office squabbles in *Connick*, 461 U.S. at 148, and *Barnes*, 840 F.2d at 982, and more public than the speech in *Murray*, 741 F.2d at 438. Presumably the public is, and should be, at least as concerned about these alleged defects as it was about, for instance, rule violations by a university athletic department, *see Hall*, 856 F.2d at 259, or teachers' dress and its purported relationship to the market for government debt, *see Connick*, 461 U.S. at 146 (citing *Mt. Healthy*, 429 U.S. 274 (1977)).

Still, the District says LeFande's suit does not address a matter of public concern because its allegations relate to a mere "personnel matter." But we reject the proposition that a personnel matter per se cannot be a matter of public concern, even if it may seriously affect the public welfare. For instance, were the Chief of Police to assert the power to fire, without process, all MPD officers, paid and unpaid, that action would "be fairly considered as relating to [a] matter of political, social, or other concern to the community," *Connick*, 461 U.S. at 146, although it relates to a "personnel matter." And, while this case may present a closer question, we conclude that LeFande's speech—alleging the Chief of Police violated District law and the Constitution by significantly altering the framework by which the Reserve Corps was governed, relying in part on an emergency procedure when there was no emergency—also implicates a "matter of political, social, or other concern to the community." *Id.*; *see Hall*, 856 F.2d at 259. It exceeds "individual personnel disputes and grievances" and involves "issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government." *Hall*, 856 F.2d at 259 (quoting *McKinley*, 705 F.2d at 1114) (internal quotations and citations omitted). In short, it relates to a matter of public concern. *See id.*; *see also* Jason Cherkis, *Anger in Reserve*, Washington City Paper, Jul. 19, 2006, *available at* http://www.washingtoncitypaper.com/blogs/citydesk/

2006/07/19/anger-in-reserve (elimination of Reserve Corps members' job security led them to "cut back on volunteering," which "hit hard on July 4, when the department fielded only a fraction of its reserve phalanx").[5]

In so holding, we get support from our sister circuits. *See Lindsey v. City of Orrick, Mo.*, 491 F.3d 892, 896, 899 (8th Cir. 2007) (whether city council "pass[ed] city ordinances without public discussion" in violation of local law was "clearly" matter of public concern); *Dishnow v. Sch. Dist. of Rib Lake*, 77 F.3d 194, 197 (7th Cir. 1996) (school board's violation of a state law requiring meetings be open to the public was matter of public concern); *Zamboni v. Stamler*, 847 F.2d 73, 74, 77-78 (3d Cir. 1988) (county prosecutor's "reorganization plan" entailing "changes in certain personnel policies and procedures" was matter of public concern). And, while LeFande's allegations probably did not lead any editor to shout "Stop the presses!" (or even "Update the website!"), when the Supreme Court held speech on matters of public concern to be protected, "they did

---

[5]The District "assumes" the First Amendment protects LeFande's speech even though he is an unpaid volunteer. Appellee's Br. 7 n.1. We do too. *See Connick*, 461 U.S. at 144 (First Amendment rights may not "be infringed by the denial of or placing of conditions upon a benefit or privilege"); *Hyland v. Wonder*, 972 F.2d 1129, 1136 (9th Cir. 1992) ("[V]olunteer status . . . is a valuable governmental benefit or privilege that may not be denied on the basis of constitutionally protected speech.") (citing *Janusaitis v. Middlebury Volunteer Fire Dep't*, 607 F.2d 17 (2d Cir. 1979)). The District argues, however, that "[i]t is doubtful whether Mr. LeFande was even exercising his First Amendment rights in representing a client in a lawsuit." Appellee's Br. 8. This argument ignores that fact that LeFande's "proposed Plaintiff Class consist[ed] of all MPD Reserve Officers," of which he was one. Compl. ¶ 11, *MPD Reserve Officers v. Ramsey*, C.A. No. 06-1223 (D.D.C. July 6, 2006). He was not, therefore, simply "representing a client;" he was speaking for himself as well and he "had a personal First Amendment right at stake." Appellee's Br. 8.

not mean matters of transcendent importance, such as the origins of the universe or the merits of constitutional monarchy; they meant matters in which the public might be interested, as distinct from wholly personal grievances . . . and casual chit-chat." *Dishnow*, 77 F.3d at 197. LeFande's speech was more than a personal grievance; it was a challenge to the implementation, without notice, of the framework by which the Reserve Corps was to be governed.

To be sure, as LeFande admits, the context of his speech affects him privately. *See* Appellant's Br. 10-11, 27. In seeking to preserve procedural and collective bargaining rights, he was also working to secure his own position. As we explained in *O'Donnell*, however, "the presence of a personal motivation for an employee's speech, although certainly a factor in the public-concern analysis, need not destroy the character of a communication as one of public concern. . . . Indeed, it may be that those employees who are dissatisfied with their workplaces are precisely those who are likeliest to notice malfeasance, and be willing to speak up about it." 148 F.3d at 1134 (internal citation omitted). Here, as in *O'Donnell*, notwithstanding the employee's private motive, his speech nonetheless implicated a matter of public concern and thus warranted protection under the First Amendment.[6]

\*\*\*

For the foregoing reasons, we reverse the district court's dismissal of LeFande's complaint and remand for further proceedings consistent with this opinion.

*So ordered.*

---

[6]We express no opinion regarding LeFande's ability to satisfy the remaining three elements of his retaliation claim, *see Wilburn*, 480 F.3d at 1149, as the district court has yet to reach them.